# In the United States Court of Appeals for the Third Circuit

————————

SHERICE SARGENT, INDIVIDUALLY, AS NEXT FRIEND OF HER MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED; MICHELE SHERIDAN, INDIVIDUALLY, AS NEXT FRIEND OF HER MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED; AND JOSHUA MEYER, INDIVIDUALLY, AS NEXT FRIEND OF HIS MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

v.

THE SCHOOL DISTRICT OF PHILADELPHIA, ET AL.,

*Defendants-Appellees,*

————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, Philadelphia Division
Case No. 2:22-cv-01509-CFK

————————

## APPELLANTS' BRIEF

————————

WALTER S. ZIMOLONG
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

REED D. RUBINSTEIN
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The appellants respectfully request oral argument, as the issues in this case are sufficiently important and complex to warrant argument time.

# TABLE OF CONTENTS

Statement regarding oral argument ........................................................................... ii

Table of contents ...................................................................................................... iii

Table of authorities .................................................................................................... v

Statement of jurisdiction ........................................................................................... 3

Statement of the issues .............................................................................................. 4

Statement of related cases and proceedings ............................................................ 5

Statement of the case ................................................................................................. 5

    I.    Evidence of the defendants' racial motivations ................................. 10

        A.    Deposition testimony ................................................................. 10

        B.    City council committee hearing of December 15, 2021 ........... 19

    II.    Evidence of the racial impact of the school district's new admissions policies ......................................................................... 23

    III.    The plaintiffs ..................................................................................... 26

        A.    Sherice Sargent ......................................................................... 26

        B.    Michelle Sheridan ...................................................................... 28

        C.    Joshua Meyer ............................................................................. 29

    IV.    The district-court proceedings ........................................................ 32

Standard of review ................................................................................................... 32

Summary of argument .............................................................................................. 33

Argument .................................................................................................................. 34

    I.    There is a genuine dispute as to whether the change in admissions policies was motivated by racial considerations ............... 34

    II.    There is a genuine dispute as to whether the change in admissions policies had a racial effect ............................................... 46

Conclusion ............................................................................................................... 51

Certificate of bar membership ................................................................................. 52

Certificate of compliance ........................................................................ 53

Certificate of serviceå........................................................................... 54

# TABLE OF AUTHORITIES

**Cases**

*Alcoa, Inc. v. United States*, 509 F.3d 173 (3d Cir. 2007) .......................................... 31

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .......................................................... 47

*Coalition for TJ v. Fairfax County School Board*,
 68 F.4th 864 (4th Cir. 2023) ......................................................... 46

*Doe ex rel. Doe v. Lower Merion School District*,
 665 F.3d 524 (3d Cir. 2011) ................................................. 2, 3, 32, 42

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013) ..................................... 34

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .......................................................... 9, 34

*Guinn v. United States*, 238 U.S. 347 (1915) .......................................................... 47

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .............................................................. 43

*Miller v. Johnson*, 515 U.S. 900 (1995) ........................................................... 46, 48

*Parents Involved in Community Schools v. Seattle School District No. 1*,
 551 U.S. 701 (2007) ......................................................................... 34

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) .................. 41

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................................... 39

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
 429 U.S. 252 (1977) ................................................................. 2, 3, 47, 48

 *Washington v. Davis*, 426 U.S. 229 (1976) .......................................................... 47

**Statutes**

28 U.S.C. § 1291 ............................................................................................. 2

28 U.S.C. § 1331 ............................................................................................. 2

42 U.S.C. § 2000d ...................................................................................... 31, 39

**Other Authorities**

Pa. Const. art. I, § 26 ..................................................................................... 31

Pa. Const. art. I, § 29 ................................................................................. 31, 39

In 2021, in the name of "antiracism" and "equity," the School District of Philadelphia announced that it was changing the policies for admission to its elite criteria-based high schools. Before 2021, admission to these select schools was based on academic merit, with the principal of each high school having the final say on admission. But the school district was unhappy with the racial distribution that this system generated, even though its elite criteria-based high schools were already racially diverse with no school having a white majority. The school district believed that some select schools, in particular a science and technology high school, had an underrepresentation of non-black students ("too black") and that white and Asian students were "overrepresented" in other criteria-based high schools (in other words "not black or Hispanic enough"). So it overhauled the admissions process in a conscious and intentional effort to rebalance the racial makeup of the students attending the city's elite criteria-based high schools. It did so by moving away from merit-based admissions and toward a gerrymandered lottery system—with the conscious aim of achieving a racial makeup of the student body that more closely resembles the racial demographics of the city's overall population. All students seeking admission to the elite criteria-based high schools participate in the lottery, but students who reside in certain "underrepresented zip codes" are given preference for admission over students who do not reside in those zip codes.

Although these changes to the admissions criteria are facially neutral and do not explicitly adopt racial criteria or preferences in assigning students to

criteria-based high schools, they are nonetheless unlawful because they were motivated by a racially discriminatory purpose and had a racially discriminatory impact on the students admitted to these criteria-based schools. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 549 (3d Cir. 2011) (facially neutral policies violate the Equal Protection Clause if they "(1) had a [racially] discriminatory effect and (2) were motivated by a [racially] discriminatory purpose." (quoting *Bradley v. United States,* 299 F.3d 197, 205 (3d Cir. 2002)); *see also Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a [racially] discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified."); *Doe*, 665 F.3d at 551 n.42 ("The racially discriminatory purpose need not be the sole or primary factor motivating the decision to adopt the challenged action." (citing *Arlington Heights*, 429 U.S. at 266)). Yet the district court awarded summary judgment to the school district, holding that the plaintiffs had failed to produce *any* evidence of racially discriminatory impact or purpose. The district court's holding is wrong, and the Court should vacate its judgment and remand the case for trial.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because the case arises under federal law. This Court's appellate jurisdiction rests on 28 U.S.C. § 1291 because the plaintiffs have appealed a final decision of the district court. Appx3. The district court issued its final decision on October 11,

2024, Appx3, and the plaintiffs filed a timely notice of appeal on November 7, 2024, Appx1.

## STATEMENT OF THE ISSUES

A facially neutral school-admissions policy will violate Title VI and the Equal Protection Clause if it is motivated (even in part) by a racially discriminatory purpose and has a racially discriminatory effect. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 549 (3d Cir. 2011); *see also Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977). The district court granted summary judgment to the School District of Philadelphia after holding that there was no evidence that racial motivations had played any role in the school district's decision to change the admissions policies to its criteria-based high schools, and that there was no evidence that the changes in those admissions policies had a racially discriminatory impact. The issues on appeal are:

1. Is there a genuine dispute as to whether racial motivations played any role in the decision to change the admissions policies to the School District of Philadelphia's elite criteria-based high schools?

2. Is there a genuine dispute as to whether the change in the school district's admissions policies affected the racial makeup of the students admitted to its elite criteria-based high schools?

# STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel is unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this court or any other court or agency, state or federal.

# STATEMENT OF THE CASE

The School District of Philadelphia maintains a system of public high schools. The city's public high schools fall into one of three categories: (1) neighborhood high schools, also known as "catchment" schools; (2) citywide admission high schools; and (3) special-admission or criteria-based high schools, also known as "magnet" schools. Appx1212 (¶ 11); Appx1401–1402; Appx1410–1411.

Neighborhood or catchment high schools are open to students living within certain defined geographical neighborhood boundaries. Appx1212 (¶ 12); Appx1401; Appx1410–1411. Citywide admissions high schools accept students from across the city. Appx1212 (¶ 13). These schools do not use merit-based admission criteria, and admission to a citywide school is based on the submission of an application and the outcome of a computerized lottery. Admission to these schools is subject to space availability. Appx1212 (¶ 13); Appx1401–1402; Appx1411.

Special-admission or criteria-based high schools (also called magnet schools), like citywide admissions schools, do not have an attendance boundary and students must apply for admission. Appx1212 (¶ 14). Admission to these criteria-based or magnet schools had traditionally been determined by

"competitive entrance requirements related to attendance, punctuality, behavior, grades, and standardized test scores"[1] until the school district decided to change the selection process in 2021. The school district has described these criteria-based high schools as those "which offer a rigorous, enriched curriculum that may concentrate on a particular discipline or area of study, such as mathematics, natural sciences, engineering, humanities, social sciences, or fine and performing arts." Appx1212 (¶ 15); Appx1213 (¶ 16); Appx1411.

In the spring of 2021, the school district's Board of Education approved a policy document entitled "Board of Education Goals & Guardrails." Appx1214 (¶¶ 20–21); Appx1418–1421. The Goals & Guardrails document includes a section entitled "Addressing Racist Practices," which announces that "our students' potential will not be limited by practices that perpetuate systemic racism and hinder student achievement." Appx1421. Indicator 4.1 of the Goals & Guardrails document states:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

Appx1421. Indicator 4.2 of the Goals & Guardrails document states:

> The percentage of suspensions received by Black/African American students will decrease from 72.6% in August 2020 to

---

1.    Appx1213 (¶ 16); Appx1411; Appx1412.

no more than 48.3% (proportional to population as a whole) by August 2026.

Appx1421.

Later in 2021, after approving this "Goals & Guardrails" document, the school district decided to change the standards for admission to its criteria-based schools, starting with students applying for admission during the 2021–2022 school year, who would be seeking admission for the 2022–2023 school year. Appx1214–1215 (¶¶ 18–19, ¶¶ 22–25); Appx1313. The school district changed the admissions process for its criteria-based schools by: (a) eliminating the Pennsylvania System of School Assessment (PSSA) test as a criterion for admission; (b) eliminating letters of recommendation and interviews as criteria for admission; and (c) requiring applicants to sit for a 90-minute essay exam, which is administered and scored by a computer program called MI Write. Appx1214 (¶¶ 18–19, ¶¶ 22–23); Appx1313. Only students whose computerized essay score equals or exceeds 22 out of 30 would be eligible for admission to Masterman and Central, and only students with essay scores at 17 or above would be eligible for admission to Carver, Parkway, and Palumbo. Appx1214 (¶ 23).[2]

The school district further changed its admission practices by instructing criteria-based schools to admit students by lottery if they satisfied the minimum grade cut-offs (As and Bs) and minimum essay-score cut-offs (17 or 22),

---

2. The school district later decided to lower to cut-off score for admission to Masterman and Carver from 21.5. Appx1780–1781 (¶ 6).

rather than allowing principals to select the best qualified students from among the applicant pool, as had been done previously. Appx1215 (¶ 24); Appx1313.

Finally, the school district changed its admission practices by requiring students residing in six specified zip codes—19121, 19132, 19133, 19134, 19135, and 19140—to receive preferences in the lotteries for admission to Masterman, Central, Carver, Parkway, and Palumbo. Appx1215 (¶ 25); Appx1313 ("Zip code preference will be applied at select criteria-based schools for students who meet the minimum qualifications"). Based on 2020 census data, the racial makeup of these six preferred zip codes is as follows:[3]

|  | Black | Hispanic | White | Asian |
|---|---|---|---|---|
| 19121 | 72.2% | 6.5% | 15.4% | 3.5% |
| 19132 | 91.9% | 3.2% | 2.5% | 1.15% |
| 19133 | 36.7% | 57.7% | 3.6% | 3.5% |
| 19134 | 13.4% | 51.3% | 30.3% | 1.6% |
| 19135 | 20.9% | 24.2% | 44.7% | 5.7% |
| 19140 | 50.1% | 42.2% | 4.3% | 1.7% |
| overall student body in school district | 47% | 23% | 15% | 10% |

Five of the six preferred zips codes are located in North Philadelphia, and the remaining zip code (19135) is located in the northeast.[4] No zip codes from

---

3. The term "white" in the chart refers to non-Hispanic whites, and the term "black" refers to non-Hispanic blacks. The data were obtained from data.census.gov. Appx1783–1784 (¶ 4).

4. Maps of Philadelphia that highlight the territory of these preferred zip codes can be found at Appx1768–1773. Appx1783–1784 (¶ 4) (authenticating the maps).

South Philadelphia, Southwest Philadelphia, or West Philadelphia appear on the preferred zip-code list, even though many pockets of these communities are impoverished and overwhelmingly populated by minorities.[5] The school district has openly admitted that the changes to the admissions process were made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Appx1313.

Each of the five magnet schools affected by the new lottery-with-zip-code-preference system already had a majority-minority enrollment before the school district's changes to the selection process, and each of them had a critical mass of black, Hispanic, and Asian students. The racial enrollment for the 2021–2022 school year at Masterman, Central, Carver, and Palumbo was as follows:

| | Asian | Black/African American | Hispanic/ Latino | Multi-Racial/ Other | White |
|---|---|---|---|---|---|
| Academy at Palumbo | 36% | 34% | 11% | 4% | 15% |
| Carver High School of Engineering and Science | 14% | 61% | 11% | 6% | 8% |
| Central High School | 38% | 18% | 8% | 5% | 31% |
| Masterman High School | 26% | 16% | 7% | 9% | 41% |
| Philadelphia School District | 7% | 52% | 22% | 5% | 13% |

---

5. The school district claims that it selected these six preferred zip codes "because they had the lowest percentage of students enrolled at Masterman, Central, Carver, and Palumbo between 2017 and 2021." Appx36.

Appx1215–1216 (¶ 28). As can be seen from the chart, at least one of the school district's elite magnet schools (Carver) has a black enrollment that far exceeds the black population of the school district as a whole. And while black and Hispanic student enrollment at Masterman and Central falls below the percentages that appear in the overall student body of the school district, it still constitutes a "critical mass" under *Grutter v. Bollinger*, 539 U.S. 306, 329–36 (2003).

## I.  EVIDENCE OF THE DEFENDANTS' RACIAL MOTIVATIONS

### A.  Deposition Testimony

The school district has admitted that the overall package of changes to the admissions process was made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." High School Directory 2022 Admissions (Appx 1313).

The school district court's superintendent at the time these changes were made, Dr. William R. Hite Jr., testified that during his tenure as superintendent he was aware of "systems within the school district that led to racial inequity." Hite Dep. at 42:5–9 (Appx393). One system of racial inequity that Dr. Hite identified is "disproportionality." *See id.* at 42:11–13 (Appx393). Dr. Hite testified that "disproportionality refers to the percentage of a subgroup that is then more heavily represented in like—than the percentage of the subgroup." *See id.* at 42:13–16 (Appx393). According to Dr. Hite, disproportionality occurs when a racial group's percentage as a part of a subgroup is not proportional to the racial group's percentage in the overall population.

*See id.* at 43:3–9 (Appx394). Dr. Hite regards disproportionality as a system of racial inequity. *See id.* at 43:24–25 (Appx394), 44:1–2 (Appx395). Dr. Hite acknowledged that the school district identified the racial make-up of its criteria-based schools as a "disproportionality," *id.* at 44:10–15 (Appx395), and that the school district made policy changes during his tenure to address systems of racial inequities, *see id.* at 46:7–10 (Appx397). Dr. Hite believes that whites maintain privilege over blacks in society in general. *See id.* at 59:3–8 (Appx410). Dr. Hite also believes that white students maintain privilege over black and Latino students within the School District of Philadelphia. *See id.* at 62:19–23 (Appx413), 63:4–8 (Appx414). Hite testified that the data showing a disproportionately low number of Hispanic and Latino students at the city's criteria-based high schools are problematic, as well as the data showing a disproportionately low number of black students at Masterman and Central. *See id.* at 114:18–115:2 (Appx465–466); *id.* at 115:4–7 (Appx466); *id.* at 115:8–11 (Appx466).

Karyn Lynch testified as the school district's Rule 30(b)(6) designee. She acknowledged in her deposition that the racial demographics of Central, Masterman, Carver, Parkway Middle, and Palumbo depart from the racial demographics of the overall student body of the school district. *See* Lynch Dep. at 111:13–18 (Appx291). Lynch also acknowledged that the school district responded to the death of George Floyd and the national attention on racism by examining all of its processes, policies, and practices to "ensure equity." *See id.* at 129:18–22 (Appx309). One of the practices reviewed to

"ensure equity" was the school selection process used for criteria-based schools. *See id.* at 129:18–25 (Appx309). This "equity view" or "equity lens" review that the school district applied was a process in which the school district's policies and procedures were reviewed for bias and to determine if "bias or discrimination [was] involved in the development of the process or procedure or policy." *See id.* at 56:6–19 (Appx236).

Lynch also testified that the school district is concerned about the disproportionately low black enrollment numbers at Central High School. *See* Lynch Dep. at 111:9–24 (Appx291); *see also id.* at 95:23–25 (Appx275) (acknowledging that the school district is "very concerned about the lack of achievement among Black and Brown students in the School District of Philadelphia."). She acknowledged that the school district is "concerned about the lack of achievement or that—for Black and Brown students, particularly boys, that their academic achievement has not been the same, and so we look for measures, ways, practices, we look to other jurisdictions to see what they are doing that are going to lead to success or more success for students that are Black and Brown within the School District of Philadelphia." *Id.* at 97:7–14 (Appx277). Lynch also testified that the lack of achievement for "Black and Brown" boys was a result of racism. *See id.* at 97:19–98:19 (Appx277–278). She stated: "I think that it is important for all children to have the same opportunities. And if racism is preventing those opportunities, I think that those practices should be changed." *Id.* at 98:16–19 (Appx278). Lynch testified that the zip-code preference was added in response to the "equity lens"

review, which revealed the old selection system was "biased." *See id.* at 44:21–56:19 (Appx224–236).

When the school district applies an "equity lens" to a policy it asks: "How does the proposed policy, program, practice, decision, or action address or advance opportunities for equity across race and other identifiers, as defined by our SDP definition of equity?"[6] The school district's "equity lens" review was designed to make the school selection process more equitable. Jubilee Dep. at 147:21–25 (Appx636), 148:1 (Appx637).

The school district believes and claims that "deep racial and ethnic inequities that exist in Philadelphia's schools today are a direct result of structural racism—the historical and contemporary polices, practices, and norms that create and maintain white supremacy and how it manifests in schools." School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia (Appx688). The school district further believes that "all of us are part of a racist system." *Id.* (Appx692).

Sabriya Jubilee is the school district's Chief of Equity and oversees the School District's Office of Diversity, Equity, and Inclusion (DEI). *See* Jubilee Dep. at 8:23–25 (Appx497), 9:1 (Appx498). Jubilee has held this office since

---

6. https://www.philasd.org/dei/equity-framework [[https://perma.cc/S8MJ-KEMD]]. (To find this quote on the webpage, click on the orange box that says "Advancing Equity" or move the cursor on top of that box.) *See* Jubilee Dep. at 38:2–39:3 (Appx527–528) (authenticating this webpage); *id.* at 38:25–39:3 (Appx527–528) ("Anything that appears on the School District's website, whether it be my page or the School District's page, is a representation of the School District.").

July of 2021. *See id*. at 9:6–9 (Appx498). Jubilee is in charge of centering the school district's work through a lens of racial equity. *See* Hite Dep. at 68:4–11 (Appx419). Beginning in July of 2021, Jubilee applied an "equity lens" to the processes that were being proposed for the new school selection process. *See id*. at 71:2–14 (Appx422). Jubilee testified that part of the equity-lens review is an "opportunity to deconstruct, to take apart, to analyze, [and] to assess." Jubilee Dep. at 59:2–7 (Appx548). The school selection process was one policy that Jubilee deconstructed and analyzed. *See id*. at 59:8–10 (Appx548).

During her racial equity review of the school selection process, Jubilee became aware of the racial demographics of Carver, Parkway Middle, Masterman, Central, and Palumbo. *See* Jubilee Dep. at 26:12–31:21 (Appx515–520). Jubilee testified that she was concerned with the racial disproportionalities that existed at Carver, Parkway, Masterman, Central, and Palumbo. *See id*. at 32:22–36:15 (Appx521–525); *see also id*. at 36:14–15 (Appx525) ("Any time there's disproportionality, equity is a concern."). Jubilee testified that the racial demographics of these schools were "one set of data" that was considered in making changes to the school selection process. *See id*. at 33:1–10 (Appx522).

Jubilee believes that certain racial groups have power over others. *See* Jubilee Dep. at 60:22–25 (Appx549). Specifically, Jubilee believes whites have power over groups that identify as non-white. *See id*. at 62:5–13 (Appx551). Jubilee also believes that Christians have privileges over non-Christians, with the exception of Jews. *See id*. at 89:18–25 (Appx578), 90:3–18 (Appx579). Ju-

bilee believes that Jews are not a "historically marginalized group." *Id.* at 90:14–18 (Appx579). Jubilee testified that the school-selection process that existed before the changes reflected a system in which "one group has power over another" and in which blacks lacked privilege and power relative to other groups. *See id.* at 64:5–20 (Appx553), 68:4–9 (Appx557).

Jubilee believes that "[i]dentifying as white racially in the context of the United States puts one in a position of privilege and power off of that racial identification." *See id.* 74:6–11 (Appx563). Jubilee further believes that this privilege and power could lead to the ability to attend certain schools. *See id.* at 74:13–18 (Appx563). Jubilee believes that this privilege and power could extend to educational opportunities within the School District of Philadelphia. *See id.* at 75:2–6 (Appx564). Jubilee believes that if a system of meritocracy is used to exclude certain groups, then it is an "institutionalization of norms that needs to be dismantled from [a] [racial] equity perspective." *Id.* at 106:2–5 (Appx595). As director of DEI, Jubilee does not use colorblindness. *See id.* at 109:22–25 (Appx598). Jubilee believes that "[b]eing colorblind is not a good thing." *Id.* at 128:2–9 (Appx617). Jubilee does not use colorblindness because it is "an erasure of racial identity." *Id.* at 110:1–4 (Appx599). Jubilee believes that if colorblindness is "utilized as a way to increase privilege for a racial group which has historically always had privilege because their race," then it is a "institutionalized norm" that needs to be "dismantled." *Id.* at 111:20–25 (Appx600); 112:1–7 (Appx601).

Jubilee testified that the changes that the school district made to the school-selection process for criteria-based schools were not colorblind. *See* Jubilee Dep. at 128:14–17 (Appx617). Jubilee also testified that the changes made to the school-selection process for criteria-based schools were not colorblind because Jubilee believes that "equity is not to be colorblind in the sense that you disregard a human's race, culture or ethnicity." *Id.* at 128:4–6 (Appx617). Jubilee believes that the way people participated in the former school-selection process was an example of "white supremacy culture." *Id.* at 129:16–21 (Appx618). Jubilee believes that "[h]istorically those identified racially as White have had an opportunity and benefited from systems of power that non-Whites have not traditionally historically had the same benefits from." *Id.* at 126:20–25 (Appx615). She testified that "[o]ur goal as a school system is to be equitable across — in the entire system regardless of the identity. **Race is a factor**, but it is not an isolated factor in any of the decision that we make toward equity." *Id.* at 164:9–16 (Appx653) (emphasis added).

Jubilee further explained the need to consider race as a factor in admissions policies and decisions: "[I]f the goal of the admission decision is to be more racially equitable, then two students who have the same academic achievement, one being White and one being Black, if Blacks students are not being represented at the same rate, then there could be plausibility for race to be considered, a student's race to be considered, if the goal is to be racially equitable." Jubilee Dep. at 161:11–18 (Appx650). She testified: "If the goal is to increase the presence of qualified Black students because they're not rep-

resented at the same rate as their Asian counterparts, then in an example like that the Black student's race would be considered." *Id.* at 162:23–163:2 (Appx651–Appx652). She also stated that if her review of the school-selection process through an "equity lens" revealed privilege, then the process was to be changed. *See id.* at 90:20–91:2 (Appx579–Appx580). Jubilee testified that when she reviewed the school-selection process through an "equity lens," it revealed privileges. *See id.* at 91:3–6 (Appx580).

Finally, Jubilee testified that the racial demographics of the five zip codes was a consideration in their selection. *See* Jubilee Dep. at 152:25–153:19 (Appx641–Appx642). She further testified that the zip-code preference was included to make the selection process more equitable. *See id.* at 127:7–10 (Appx616).

Following the death of George Floyd, the school district issued an "Anti-Racism Declaration." *See* Hite Dep. at 27:10–28:18 (Appx378–379), 30:12–25 (Appx381), ECF No. 91-2; *see also* https://www.philasd.org/antiracism [[https://perma.cc/EWW3-5UGC]], ECF No. 91-4. The Anti-Racism Declaration was issued to ensure that the school district was "assessing all policies and practices for inequitable types of outcomes." *See* Hite Dep. at 28:6–8 (Appx379). According to the Anti-Racism Declaration, the school district could not fulfil its mission to "ensure we provide the necessary conditions needed for all of our students to excel" because "some of our students are forced to witness and endure acts of hatred because of the color of their skin [and] are dehumanized for where they come from and how they look, and live

17

within conditions that place their bodies under constant attack, rendering them voiceless by the very system that is supposed to protect and empower them." Appx679. In the Anti-Racism Declaration, the school district commits to "uprooting policies, deconstructing processes, and eradicating practices that create systems of privilege and power for one racial group over another." *Id.* The Anti-Racism Declaration further states that "[now] is the time to expand our efforts and take collective action, challenging and changing the ways in which our norms, values, and structures uphold systems of racism." *Id.* The Anti-Racism Declaration concludes that the work to be done pursuant to the Anti-Racism Declaration will be "[centered] through a lens of racial equity." *Id.*

The school district's Anti-Racism Declaration was written by a collection of school district officials including Sabriya Jubilee and Dr. Hite's chief of staff, Alicia Prince. *See* Hite Dep. at 29:1–7 (Appx380). When the school district published the Anti-Racism Declaration, it claimed that it was aware of "school district policies, processes, and practices that created a system of privilege and power for one racial group over another." *Id.* at 48:1–6 (Appx399). Dr. Hite testified that the School District, in accordance with its Anti-Racism Declaration, "would have eradicated any policy that advantaged one demographic group over another demographic group. Or attempted to anyway." Hite Dep. at 57:18–25 (Appx408), 58:1–3 (Appx409). Dr. Hite testified that the "norms, values, and structures" referred to in the Anti-Racism

declaration that must be changed are systems that create disproportionality. *See id.* at 64:25 (Appx415), 65:1–7 (Appx416).

### B.     City Council Committee Hearing of December 15, 2021

On December 15, 2021, the City Council of Philadelphia, Committee on Education held a hearing on the school district's plans to change the admissions process for its criteria-based schools. Appx1438–1701. Parents, members of the city council, and members of the community spoke overwhelmingly against the changes and blasted the school district for the lack of transparency in the way the new selection criteria were imposed. Councilmember David Oh was nonplussed at the zip-code preferences:

> [T]here were no zip codes in West Philadelphia, no zip codes in Southwest Philadelphia, no zip codes in South Philadelphia, no zip codes in most parts of Philadelphia that represent underserved communities. So it was unclear to me at that time what the basis of all of this was.

Appx1445–1446. Councilmember Oh also criticized the school district for announcing these changes immediately before the application process began:

> [T]his was announced the day before a seven-week window open for applications to these criteria-based admissions schools. And people were reeling from the fact that an entirely new process had been put in without their knowledge, without their opportunity to discuss or to have experts weigh in on it and that it was already implemented.

Appx1446. Councilwoman Helen Gym was equally critical of the school district for springing these changes shortly before the application process opened and for keeping parents in the dark about it:

> [I]n terms of process, announcing a brand new high school se-
> lections process on the day that high school selection effectively
> with almost no information going to parents is irresponsible. It
> created chaos and uncertainty, fear and suspicion. That is the
> wrong approach towards any school system, towards its stu-
> dents, towards its parents and towards its educators and towards
> our City.

Appx1451. She also criticized the idea of using computer-scored essays to de-

termine eligibility for admission. Appx1453 ("It is shocking to me that a

computer would read and review essays for applications to a school. . . .

[A]lgorithms, removing human judgment are no way a form of equity.").

Councilmember Jamie Gauthier criticized the zip-code preferences as overly

blunt and insufficiently calibrated. Appx1456–1457.

State Representative Donna Bullock, who chairs the Pennsylvania Legis-

lative Black Caucus, appeared at the hearing and sharply criticized the pro-

cess by which the school district implemented these new admission policies:

> The School District's development and implementation of the
> new admissions process is fraught with miscommunication, lack
> of transparency, conflicting information and mishaps, such as
> the total system failure during the administration of the online
> writing assessment at one school. These things continue to call
> on and to question the effectiveness of the policy and more spe-
> cifically, the ability of the School District to execute it.

Appx1466–1467. Professor Joshua Wilson of the University of Delaware testi-

fied that the school district was misusing the computer-scored essay because

MI Write was never intended to be used without a teacher or human rater

evaluating the student's writing. Appx1474–1475. And parent after parent

testified about how the school district's new admissions policies harmed

their children and eroded the meritocracy that had previously determined entrance into the city's magnet schools. Appx1565–1574 (Sherice Sargent); Appx1575–1579 (Tanya Folk); Appx1579–1584 (Wallette Carter); Appx1584–1589 (Miriam Hill); Appx1589–1594 (Eric Santoro).

Two of the defendants, Sabriya Jubilee and Karyn Lynch, testified at the hearing on behalf of the school district and defended the proposed changes. Dr. Jubilee, who serves as Chief of Equity for the School District of Philadelphia, testified as follows:

> On June 15, 2020 in the wake of the murders of Breonna Taylor, Ahmaud Aubery, George Floyd and countless others, as a District we released [our] statement on anti-racism. In this statement, we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.
>
> The upending of privilege highlighted here is not simply in reference to a configuration of numbers or an assessment of differences in skin color or features, but rather speaks to the destruction of a system and the dismantling institutionalization of norms. It doesn't just ask for us to set aside seats as a way to appease a few, but rather challenges us to explore questions of why, who and for what.
>
> Through the school selection process, we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City. But this presentation, I am not speaking solely about visibility, but more about the impact of opportunity, access and power.

Appx1521–1522. Karyn Lynch, who serves as the Chief of Student Support Services for the School District of Philadelphia, testified that the changes to the school-selection process were made in response to the murder of George Floyd and inspired by the school district's "Goals & Guardrails" document:

> In addition to the removal of the PSSA as a criteria for the school selection process last year—this year, not last year, our District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we committed to examining all of our processes, procedures and practices to ensure equity and (inaudible). . . .
>
> For more than a year, the School District obtained feedback about the school selection process and listened to individuals and representatives of groups to inform the improvements to the school selection process. Several public meetings held by the Board of Education as its members considered the Board's goals and guardrails.
>
> One indicator for the guardrails is ending racist practices as I've shared in our policies and procedures.

Appx1530–1532. Ms. Lynch also admitted that "racial dynamics" (as well as other factors) played a role in the school district's decision to switch from merits-based admissions to the lottery system with zip-code preferences. Appx1558 ("[A] good deal of the discussion has been about access and equity to these schools, so it's not just based on racial dynamics."). And Ms. Lynch warned that these changes were just "the beginning with more to come with regard to access and equity." Appx1544.

Only one parent, Stephanie King, testified in support of the proposed changes. Appx1668–1671. She claimed that "much of the objection to this policy is privileged and racist," and she denounced the "privileged parents who are simply [upset] that they rigged their game towards the wrong test." Appx1669–1670. Ms. King continued:

> Statistics do not lie. Philadelphia's magnet schools are not representative of Philadelphia's demographics or zip codes and have become overwhelmingly a concentration of privilege. This policy levels the playing field while still requiring excellence. The people protesting it are of self-interest, should be ashamed of themselves.
>
> If these Councilmembers complaining and parents protesting just don't want to send your kids with poor people even when they're qualified, then just say that instead of this fake concern, and take the word fair out of your mouth.

Appx1670–1671.

## II. Evidence Of The Racial Impact Of The School District's New Admissions Policies

The school district records the racial and ethnic demographics of each year's applicants to its criteria-based high schools, which is available at http://bit.ly/3LjWJIP [[https://perma.cc/66AE-GN52]]. *See* Jubilee Dep. at 38:25–39:3 (Appx527–528) ("Anything that appears on the School District's website, whether it be my page or the School District's page, is a representation of the School District."). The School District also maintains data regarding the admissions offers for each criteria-based high school based on the applicant's race and ethnicity. And the School District keeps data regarding the

acceptances for each criteria-based school based on the applicant's race and ethnicity.

The racial demographics for accepted applicants to criteria-based high schools for the 2021–2022 school year, the year immediately prior to the changes in the school selection process, are as follows:

Table A.4. SA admission offers by race/ethnicity for District rising 9th grade applicants, by receiving school

| Receiving SA School | Asian | Black/ African American | Hispanic / Latinx | Multi-Racial/ Other | White |
|---|---|---|---|---|---|
| Academy at Palumbo | 233 | 81 | 72 | 41 | 183 |
| Arts Academy at Benjamin Rush | 25 | 29 | 32 | 17 | 58 |
| Bodine, William W. HS | 85 | 79 | 51 | 25 | 81 |
| Central HS | 239 | 98 | 45 | 46 | 254 |
| Creative and Performing Arts | 22 | 53 | 29 | 18 | 54 |
| Engineering & Science High | 164 | 127 | 40 | 34 | 145 |
| Franklin Learning Center | 109 | 234 | 169 | 35 | 85 |
| Girard Academic Music Program | 29 | 21 | 8 | 8 | 55 |
| Girls, Phila HS | 92 | 142 | 25 | 27 | 49 |
| Hill-Freedman World Academy | 12 | 148 | 19 | 9 | 15 |
| Lankenau HS | 13 | 117 | 31 | 12 | 18 |
| Masterman, Julia R. HS | 37 | 24 | 12 | 12 | 48 |
| Motivation HS | 8 | 90 | 5 | 6 | 1 |
| Parkway Center City Middle College HS | 52 | 88 | 29 | 17 | 27 |
| Parkway West HS | 1 | 48 | 2 | 6 | 0 |
| Parkway-Northwest High | 7 | 155 | 18 | 10 | 14 |
| Saul, Walter B. HS | 12 | 125 | 55 | 15 | 74 |
| Science Leadership Academy | 34 | 38 | 20 | 14 | 55 |
| Science Leadership Academy at Beeber | 20 | 76 | 12 | 20 | 51 |

Note: This table only lists SA schools and not SA programs located within a neighborhood or CW school.

Appx748; *see also* Appx785 (¶ 6) (authenticating these data). The racial demographics for accepted applicants to criteria-based high schools for the 2022–2023 school year, the year immediately after the changes in the school selection process, are as follows:

Table A.4. CB admission offers by race/ethnicity for District rising 9th grade applicants, by receiving school

| Receiving SA School | Asian | Black/ African American | Hispanic / Latinx | Multi-Racial/ Other | White |
|---|---|---|---|---|---|
| Academy at Palumbo | 166 | 149 | 95 | 48 | 151 |
| Arts Academy at Benjamin Rush | 14 | 28 | 31 | 6 | 72 |
| Bodine, William W. HS | 72 | 90 | 74 | 22 | 74 |
| Central HS | 216 | 146 | 85 | 39 | 167 |
| Creative and Performing Arts | 19 | 65 | 25 | 9 | 57 |
| Engineering & Science High | 145 | 160 | 70 | 32 | 108 |
| Franklin Learning Center | 86 | 227 | 158 | 32 | 60 |
| Girard Academic Music Program | 33 | 22 | 12 | 3 | 38 |
| Girls, Phila HS | 118 | 339 | 115 | 37 | 77 |
| Hill-Freedman World Academy | 5 | 203 | 24 | 14 | 12 |
| Lankenau HS | 4 | 215 | 19 | 25 | 21 |
| Masterman, Julia R. HS | 56 | 20 | 13 | 11 | 43 |
| Motivation HS | 4 | 172 | 15 | 4 | 6 |
| Northeast HS* | 215 | 195 | 165 | 33 | 156 |
| Parkway Center City Middle College HS | 80 | 148 | 66 | 27 | 33 |
| Parkway West HS | 5 | 136 | 11 | 11 | 4 |
| Parkway-Northwest HS | 6 | 228 | 25 | 15 | 7 |
| Saul, Walter B. HS | 6 | 182 | 52 | 26 | 76 |
| Science Leadership Academy | 57 | 60 | 29 | 30 | 98 |
| Science Leadership Academy at Beeber | 13 | 107 | 6 | 22 | 41 |
| Washington, George HS* | 33 | 13 | 9 | 4 | 29 |

*Only includes criteria-based program applicants

Appx749; *see also* Appx785 (¶ 7) (authenticating these data).

The table below compares the number of admissions offers for each racial and ethnic category made by Palumbo, Carver, Central, and Masterman for the 2021–2022 and 2022–2023 school years:

### Admissions Offers

| School Year | School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|---|
| 21–22 | Palumbo | 233 | 81 | 72 | 41 | 183 |
| 22–23 | Palumbo | 166 | 149 | 54 | 25 | 51 |
| 21–22 | Central | 239 | 98 | 45 | 46 | 254 |
| 22–23 | Central | 216 | 146 | 85 | 39 | 167 |
| 21–22 | Masterman | 37 | 24 | 12 | 12 | 48 |
| 22–23 | Masterman | 56 | 20 | 13 | 11 | 43 |
| 21–22 | Carver | 164 | 127 | 40 | 34 | 145 |
| 22–23 | Carver | 145 | 160 | 70 | 32 | 108 |

The table below shows the change in the number of admissions offers made by Palumbo, Carver, Central, and Masterman for each racial and ethnic category between the 2021–2022 and 2022–2023 school years:

| School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|
| Palumbo | −67 | +68 | −18 | −16 | −132 |
| Central | −23 | +48 | +40 | −7 | −87 |
| Masterman | +19 | −4 | +1 | −1 | −5 |
| Carver | −19 | +33 | +30 | −2 | −37 |

The table below shows the percentage change in the number of admissions offers made by Palumbo, Carver, Central, and Masterman for each racial and ethnic category between the 2021–2022 and 2022–2023 school years:

| School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|
| Palumbo | −28.8% | +84.0% | −25.0% | −39.0% | −72.1% |
| Central | −9.6% | +49.0% | +88.9% | −15.2% | −34.3% |
| Masterman | +51.4% | −16.7% | +8.3% | −8.3% | −10.4% |
| Carver | −11.6% | +26.0% | +75% | −5.9% | −25.5% |

## III. The Plaintiffs

### A. Sherice Sargent

Plaintiff Sherice Sargent is the mother of a black female student who recently completed eighth grade at George Washington Carver High School of Engineering and Science (Carver), a science, engineering, and technical school for grades 7 through 12. Appx1774 (¶ 3); Appx1774 (¶ 5). When Ms. Sargent's daughter was admitted into Carver, a school district official stated that if she maintained an A/B average she would be able to continue her edu-

cation at Carver's high school. Appx1774 (¶ 6). Ms. Sargent's daughter maintained an A/B average and meets all of the criteria for admission into Carver for the ninth grade. Appx1775 (¶ 8).

Ms. Sargent's daughter, however, is not being allowed to continue her studies at Carver on account of the school district's decision to replace the school's merit-based admissions program with a lottery system. Appx1775 (¶ 9). Ms. Sargent's daughter was waitlisted at Carver (receiving waitlist number 187) and placed in Walter B. Saul High School, an agricultural school that specializes in teaching students how to become farmers. Appx1775 (¶ 11). The district eventually cancelled the waitlist for Carver so Ms. Sargent's daughter never gained admission or placement. Appx1775 (¶ 12). Neither Ms. Sargent nor her daughter lives in any of the six zip codes that receive preferential treatment in the lottery. Appx1775 (¶ 10).

Ms. Sargent's daughter has always been a highly academically motivated student. Appx1775 (¶ 13). She has been immersed in STEM (science, technology, engineering, and mathematics), and she chose Carver because of the computer-science track that they start in middle school. Appx1775–Appx1776 (¶ 14). Her older brother also attended Carver. *See id.* She started volunteering at the school four years ago because of her brother's enrollment and became interested in computer science and robotics. *See id.* She eventually left her K–8 school and enrolled at Carver because wants to follow in her brother's footsteps. *See id.*

Ms. Sargent's daughter intends to enroll in a technology-focused college. Appx1776 (¶ 15). Her goal is to gain acceptance to Drexel University's computer-science program, and Drexel has a partnership with Carver. *See id.* Saul does not have any computer science or robotics classes or programs. Appx1776 (¶ 16). Saul also has a lower graduation and college-admissions rate than Carver. Appx1776 (¶ 17). The catchment school in Ms. Sargent's neighborhood was closed five years ago due to poor performance, so Ms. Sargent has no choice but to send her daughter to schools outside their neighborhood. Appx1776 (¶ 18). The school district's new admissions policies have caused a significant decline in the number of black students enrolled at Carver. Appx1776 (¶ 20).

## B. Michelle Sheridan

Plaintiff Michele Sheridan is the mother of a student who recently completed eighth grade at Christopher Columbus Charter School. Appx1778 (¶¶ 3–4). Ms. Sheridan's son is non-white (bi-racial). Appx1778 (¶ 5). Ms. Sheridan's son applied for admission to the Academy at Palumbo, a criteria-based school. Appx1778 (¶ 6). Ms. Sheridan and her son live mere feet from the front door of the Academy at Palumbo. Appx1778 (¶ 7). Ms. Sheridan's son is an A and B student and meets all the requirements for admission into the school; he also scored 22.5 out of 25 on the school district's admission essay. Appx1778 (¶¶ 8–9). But Ms. Sheridan's son was denied admission to the Academy of Palumbo and was wait-listed at number 530. Appx1779

(¶ 10). Ms. Sheridan's family does not reside in any of the "underrepresented zip codes" that receive admissions preferences. Appx1779 (¶ 11).

Ms. Sheridan and her son are suffering irreparable harm over the school district's new admissions policies. Since Ms. Sheridan's son learned that cannot attend the Academy of Palumbo, his behavior has regressed. Appx1779 (¶ 12). He has had verbal outbursts over his inability to attend the Academy of Palumbo. *See id*. He plans to attend college someday and he has been devastated that he won't get the opportunity to take AP classes at Palumbo. *See id*. He is interested in architecture and wants to study that in college, and he feels as though his future has been derailed by the school district's refusal to allow him to attend the school that he is academically qualified to attend. *See id*. He has asked many times why he bothered working so hard when the school district court won't allow his academic achievements to control his school assignment. *See id*. Ms. Sheridan's son also wants to play football and looked forward to competing on the Academy of Palumbo's football team, and he hoped that his football achievements would boost his college applications and earn him a football scholarship. *See id*. He has completely lost that opportunity on account of the school district's racially motivated admissions policies. *See id*.

## C.   Joshua Meyer

Plaintiff Joshua Meyer is the father of a student who recently completed eighth grade at the Julia R. Masterman Laboratory and Demonstration School (Masterman). Appx1780 (¶¶ 3–4). Mr. Meyer's son is white.

Appx1780 (¶ 3). Mr. Meyer's son wants to continue his high-school studies at Masterman, which consistently ranks as the top high school not only in Philadelphia but in the entire state of Pennsylvania. He also would have been excited to attend Central High School, another school with a history of high achievement and a broad range of accelerated and exciting offerings. Appx1780 (¶ 5). Mr. Meyer's son is a stellar student, having received only one quarter grade less than an A (one 5th grade quarter of a B in music). All of his final grades were A's. He also scored over a 25 out of 30 on the school district's computer-scored writing sample, which exceeds the minimum required score of 22 for admission to Masterman and Central. Appx1780–1781 (¶ 6).

Mr. Meyer's son would have very likely been admitted to Masterman, as well as Central High School, under the merit-based admission system that was used before the school district switched to the lottery system. Under the previous regime, the top 50% (approximately) of the eighth-grade class at Masterman would be admitted to the high school, and the strong grades that Mr. Meyer's son has earned place him well within the top 50% of his eighth-grade class. In addition, virtually all Masterman eighth graders would be admitted to Central High School under the previous merit-based admission system. Appx1781 (¶ 7). But as a result of the school district's decision to replace its merit-based admissions system, Mr. Meyer's son did not get admitted to either Masterman or Central. Appx1781 (¶ 8).

Mr. Meyer has decided to enroll his son in a private school for the fall of 2022. Appx1781 (¶ 9). But either Masterman or Central would have been a better high school for Mr. Meyer's son under the previous admissions criteria, where students were accepted on the basis of merit and the institutions served as elite magnet schools for the city's most ambitious and hardest-working students. Appx1781 (¶ 10). Yet the new lottery-based admission system has so diluted the academic quality of Masterman and Central that Mr. Meyer may not even want his son to attend those schools over the private school where he is enrolled for the upcoming school year, even if his son had won admission under the new lottery-based system. Appx1781 (¶ 11).

Mr. Meyer's son is being grievously harmed by the school district's decision to change admissions standards in its effort to achieve racial balancing at the city's criteria-based high schools. Appx1781–1782 (¶ 12). He is hardworking and ambitious, and is interested in challenging himself in high school. His goal is to take intellectually rigorous courses, including a substantial number of AP courses, in order to prepare himself for the most academically challenging college career that is available to him. Appx1781 (¶ 12). Masterman presented an ideal opportunity for him to be surrounded by other students from a variety of backgrounds and coming from all over the city who shared this mindset. Appx1781–1782 (¶ 12). The top-notch education in addition to the tremendous diversity of the students was an incredible combination that helped to teach these students both graded and ungraded lessons that were vital to their growing up to be effective members of the community.

Appx1782 (¶ 12). Unfortunately, the new selection process has diminished the school's ability to provide this unique opportunity. Appx1782 (¶ 12).

## IV. THE DISTRICT-COURT PROCEEDINGS

The plaintiffs sued the School District of Philadelphia and its officials in 2022, accusing them of using racially discriminatory standards for selecting and admitting students to the city's criteria-based schools, in violation of Title VI,[7] the Equal Protection Clause, and article I, sections 26 and 29 of the Pennsylvania Constitution.[8] Appx1798–1800. But the district court granted summary judgment to the defendants, holding that the plaintiffs had failed to present any evidence of a racially discriminatory purpose or a racially discriminatory impact. Appx5–41. The plaintiffs filed a timely notice of appeal. Appx1.

## STANDARD OF REVIEW

A district court's decision to grant or deny a motion for summary judgment is reviewed de novo. *See Alcoa, Inc. v. United States*, 509 F.3d 173, 175 (3d Cir. 2007).

---

7. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

8. *See* Pa. Const. art. I, § 26 ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."); Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

## SUMMARY OF ARGUMENT

To defeat the defendants' motion for summary judgment, the plaintiffs need only to show that there is a genuine dispute as to whether the defendants' actions: (1) were motivated by a racially discriminatory purpose; and (2) had a racially discriminatory effect. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 549 (3d Cir. 2011).[9] The plaintiffs easily clear this hurdle given the evidence in the record.

The plaintiffs are entitled to a trial on the issue of racially discriminatory purpose because the school district *admits* in its Goals & Guardrails document that it changed admissions policies with the conscious aim of altering the racial makeup of the city's elite criteria-based schools. Appx1421. The district court thought it could disregard this smoking-gun evidence by claiming that it evinces only a desire to increase the percentage of black and Hispanic students who are *qualified* to attend the city's criteria-based schools— rather than the percentages of blacks and Hispanics who *ultimately attend* those schools. Appx37–38. But that distinction accomplishes nothing when the school district is admitting students *by lottery* among those deemed "qualified,"[10] which ensures that the racial makeup of the chosen students will resemble the racial makeup of the "qualified" students. More importantly, the school district itself defines and determines the "qualifications" that

---

9.  The plaintiffs must show that there is a "genuine dispute" on *both* the purpose and effect prongs to survive the defendants' summary-judgment motion.

10.  Appx1215 (¶ 24); Appx1313.

make one eligible for admission to the criteria-based schools. And the school district *redefined* those minimum qualifications in response to the Goals & Guardrails document, in a conscious effort to change the racial composition of the admitted students. Appx1214 (¶ 23). The district court erred in refusing to credit the Goals & Guardrails document (and the remaining evidence) as evidence that the changes to the school district's admissions policies were racially motivated.

There is also a genuine dispute as to whether the change in admissions policies affected the racial and ethnic makeup of the students admitted to those criteria-based schools. *See infra*, at 46–50. The data conclusively establish that the change to a lottery-with-zip-code preferences produced a dramatic increase in the number of black students admitted to Palumbo, Central, and Carver (+84%, +49%, +26%) at the expense of whites (–72%, –34%, –26%) and Asians (–29%, –10%, –12%). It also led to a massive boost in Hispanic admissions at Central and Carver (+89%, +75%). That is sufficient to create a factual question on whether the change in admissions policies had a racial effect. A court cannot award the defendants summary judgment given the evidence of racial motivation and racial impact in the record.

## ARGUMENT

### I. THERE IS A GENUINE DISPUTE AS TO WHETHER THE CHANGE IN ADMISSIONS POLICIES WAS MOTIVATED BY RACIAL CONSIDERATIONS

It is indisputable that the school district changed its admissions practices because it wanted to alter the racial makeup of its magnet schools—and to

ensure that the racial composition of those schools more closely resembled the demographics of the city as a whole. Indicator 4.1 of the Goals & Guardrails document makes this as clear as can be:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

Appx1421. The school district is not even attempting to hide its racial motivations, and it proudly proclaims that it "will" increase the black and Hispanic percentage of students deemed qualified to attend the city's criteria-based schools to its announced quota of "at least 52.0%." And then the school district announces that this will be only the *first* step in a five-year march toward racially proportional representation in the city's magnet schools. In light of the Supreme Court's repeated admonitions that "racial balancing . . . is patently unconstitutional,"[11] one can only marvel at the temerity of the school district in producing a document of this sort. Karyn Lynch also testified before the city council that the Goals & Guardrails document (as well as the murder of George Floyd) inspired the change in school district's admissions policies,[12] and that "racial dynamics" (as well as other

---

11. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003); *see also Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 730 (2007) (plurality opinion of Roberts, C.J.).

12. Appx1530–1532.

factors) played a role in the school district's decision to abandon merits-based admissions and switch to a lottery system with zip-code preferences.[13] And the school district's High School Directory for 2022 admits that the changes to the admissions process were made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Appx 1313.

The record is also replete with evidence showing that Dr. Hite, Karyn Lynch, and Sabriya Jubilee were concerned with the disproportionately low black and Hispanic enrollments at Masterman, Central, and Palumbo, and that they changed the admissions policies to boost their enrollment at the city's elite high schools in the name of "antiracism" and "equity." Dr. Hite testified that he regarded the disproportionately low percentage of black and Hispanic students at the city's criteria-based high schools as a problem. *See* Hite Dep. at 114:18–115:2 (Appx465–466); *id.* at 115:4–7 (Appx466); *id.* at 115:8–11 (Appx466). Dr. Hite further testified that the School District, in accordance with its Anti-Racism Declaration, "would have eradicated any policy that advantaged one demographic group over another demographic group. Or attempted to anyway." *Id.* at 57:18–25 (Appx408), 58:1–3 (Appx409). And he testified that the "norms, values, and structures" that the Anti-Racism declaration demands be changed are systems that create disproportionality. *See id.* at 64:25 (Appx415), 65:1–7 (Appx416).

---

13. Appx1558.

Karyn Lynch testified that the school district responded to the death of George Floyd and the national attention on racism by examining all of its processes, policies, and practices to "ensure equity." *See* Lynch Dep. at 129:18–22 (Appx309). Lynch acknowledged that one of the practices reviewed to "ensure equity" was the school-selection process used for criteria-based schools. *See id.* at 129:18–25 (Appx309). Lynch also told the city council's committee on education that the changes in the school-selection process were triggered by the death of George Floyd, to which the school district responded by "examining all of our processes, procedures and practices to ensure equity." Appx1531. She conceded that "racial dynamics" played a role in the school district's decision to adopt the lottery system with zip-code preferences. Appx1558 ("[A] good deal of the discussion has been about access and equity to these schools, so it's not just based on racial dynamics."). Lynch also testified that the school district is concerned about the disproportionately low black enrollment numbers at Central High School. *See* Lynch Dep. at 111:9–24 (Appx291); *see also id.* at 95:23–25 (Appx275) (acknowledging that the school district is "very concerned about the lack of achievement among for Black and Brown students in the School District of Philadelphia."). And Lynch testified that the zip-code preference was added in response to the "equity lens" review, which revealed that the old selection system was "biased." *See id.* at 44:21–56:19 (Appx224–236).

Then there is the deposition testimony of Sabriya Jubilee, who made no efforts to conceal her disdain for "colorblind" admissions[14] or her belief that the previous admissions system perpetuated a regime of white supremacy.[15] Jubilee is the school official who conducted the "equity lens" review of the proposals to revamp the school district's admissions policies, so her motivations and thoughts are especially relevant to the discriminatory-purpose issue. Jubilee was aware of the racial disproportionalities at Carver, Parkway, Masterman, Central, and Palumbo and declared that "[a]ny time there's disproportionality, equity is a concern." Jubilee Dep. at 32:22–36:15 (Appx521–525); *id.* at 36:14–15 (Appx525). Jubilee testified that the changes that the School District made to the school-selection process for criteria-based schools were not colorblind because "equity is not to be colorblind." *Id.* at 128:14–17 (Appx617); *id.* at 128:4–6 (Appx617). She said that "Race is a factor," though she qualified that by insisting that "it is not an isolated factor in any of the decision that we make toward equity." *Id.* at 164:9–16 (Appx653).

Jubilee also insisted that race should be a factor in admissions policies and decisions. *See id.* at 161:11–18 (Appx650) ("[I]f the goal of the admission decision is to be more racially equitable, then two students who have the same academic achievement, one being White and one being Black, if Blacks students are not being represented at the same rate, then there could be plau-

---

14. *See supra* at 13–17.

15. *See* Jubilee Dep. at 64:5–20 (Appx553); *id.* at 68:4–9 (Appx557); *id.* at 129:16–21 (Appx618).

sibility for race to be considered, a student's race to be considered, if the goal is to be racially equitable."). Most importantly, Jubilee testified that the racial demographics of the preferred zip codes was considered in their selection. *See* Jubilee Dep. at 152:25–153:19 (Appx641–Appx642); *id*. at 153:7–8 ("[A]ny time we're talking about any measure of this effort, race is always a consideration."). And she further testified that the zip-code preference was included to make the selection process more equitable. *See id*. at 127:7–10 (Appx616); *id*. at 127:8–10 (Appx616) ("A lottery was equality, the Zip code preference was equity.").

Dr. Jubilee further explained the school district's racial motivations before the city council committee on education, where she stated:

> On June 15, 2020 in the wake of the murders of Breonna Taylor, Ahmaud Aubery, George Floyd and countless others, as a District we released or statement on anti-racism. In this statement, we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.

> The upending of privilege highlighted here is not simply in reference to a configuration of numbers or an assessment of differences in skin color or features, but rather speaks to the destruction of a system and the dismantling institutionalization of norms. It doesn't just ask for us to set aside seats as a way to appease a few, but rather challenges us to explore questions of why, who and for what.

> Through the school selection process, we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of

whom do not reflect the majority demographic of our School
District or City. But this presentation, I am not speaking solely
about visibility, but more about the impact of opportunity, ac-
cess and power.

Appx1521–1522. This evinces a desire to change the school-selection process
because the previous system supposedly benefitted a "small group of stake-
holders, *many of whom do not reflect the majority demographic of our School Dis-
trict or City*." Appx1522 (emphasis added). And it explicitly invokes the mur-
ders of Breonna Taylor, Ahmaud Aubery, and George Floyd, as well as a
commitment to "anti-racism," as the impetus behind these changes.

So the school district has all but confessed that its new admissions prac-
tices were adopted for the purpose of achieving racial balancing in the city's
magnet schools—which runs headlong into the many statutory and constitu-
tional prohibitions on racial discrimination in public education. *See* 42 U.S.C.
§ 2000d ("No person in the United States shall, on the ground of race, color,
or national origin, be . . . subjected to discrimination under any program or
activity receiving Federal financial assistance."); *Shaw v. Hunt*, 517 U.S. 899,
907 (1996) ("[T]he Fourteenth Amendment['s] . . . central purpose was to
eliminate racial discrimination emanating from official sources in the States."
(citation and internal quotation marks omitted)); Pa. Const. art. I, § 29
("Equality of rights under the law shall not be denied or abridged in the
Commonwealth of Pennsylvania because of the race or ethnicity of the indi-
vidual.").

The district court held that the plaintiffs had failed to produce *any* evidence of racial motivation,[16] but none of its reasons withstand scrutiny. The district court, for example, interpreted the numerical goals in Indicator 4.1 of the Board of Education's Goals & Guardrails document as referring only to the racial composition of students who are "qualified" to attend the city's criteria-based schools, rather than the students who are admitted or who will ultimately attend those schools. Appx37–38. The Court explained:

> [T]he plain language of Indicator 4.1 and the surrounding content suggest that Indicator 4.1 merely sets a goal for the number of Black and Hispanic students who will meet the qualifications—such as the grade cutoffs—to attend criteria-based high schools by 2026. It does not suggest that those students necessarily will attend, or impose a quota on the number of Black and Hispanic qualified students that must attend. Put simply, all Indicator 4.1 reflects is a legitimate policy goal of improving academic outcomes for Black and Hispanic students. And that is not a racially discriminatory motive.

Appx37–38. But this observation does nothing to show that the school district and its officials lacked an intention or desire to alter the racial composition of the city's criteria-based schools. First, the school district is admitting students *by lottery* among those who meet the minimum qualifications,[17] which ensures that the racial makeup of the chosen students will resemble the racial makeup of the "qualified" students. It also means that any "goal" or quota regarding the racial composition of the "qualified" students will by

---

16.  Appx31–38
17.  Appx1215 (¶ 24); Appx1313.

definition serve as a goal for the racial makeup of the overall student body at the city's criteria-based schools.

Second, the school district gets to define and determine the minimum "qualifications" for admissions to its criteria-based high schools. And it is undisputed that the school district redefined those minimum qualifications in response to the Goals & Guardrails document. Appx1214 (¶ 23) ("The 2021–22 admissions process required applicants to Palumbo, Carver, Central, and Masterman to complete a 'district administered writing sample,' . . . which was administered and scored by a computer program called MI Write. Students whose computerized essay score equaled or exceeded 22 out of 30 were qualified for admission to Central or Masterman, and only students with essay scores at 17 or above were qualified for admission to Palumbo or Carver.").

When the Goals & Guardrails document specifically announces a racial-composition "goal" for the students who will be deemed "qualified" to attend the city's special-admission high schools—and when the school district alters its qualification standards in response to that publicly announced goal—there is nothing further needed to show that racial balancing was at least one motivating factor behind the school district's decision to change the "qualification" standards. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose,' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

identifiable group."). The discriminatory-purpose inquiry is unconcerned with the ultimate effects of the school district's admissions policies; it turns only on the school district's motivations for adopting the policy that it did. And the Goals & Guardrails document leaves no doubt that the school district was motivated (at least in part) by a desire to change the racial composition of the students deemed "qualified" to attend the city's criteria-based schools—as well as the racial composition of the students selected to attend. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 551 n.42 (3d Cir. 2011) ("The racially discriminatory purpose need not be the sole or primary factor motivating the decision to adopt the challenged action.").

The district court also dismissed the public statements and deposition testimony of school-district officials Sabriya Jubilee and Karyn Lynch, as well as the deposition testimony of Superintendent William Hite, denying that any of this qualified as evidence of racially discriminatory purpose. Appx33–36. The district court believed that these statements merely demonstrated that the school district and its officials were *aware* of the racial implications of their new admissions policies; they did not, in the district court's view, evince a racial *motivation* for the change. Appx33–36.

The district court was right to observe that mere knowledge or awareness of the racial effects of a chosen policy does not, without more, show racially discriminatory intent. *See, e.g.*, *Lower Merion*, 665 F.3d at 548 ("[T]he mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation"); *Hunt v.*

*Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."). But the statements from Dr. Jubilee and Ms. Lynch go beyond expressing mere knowledge or awareness that the change in admission policies will alter the racial composition of the city's criteria-based schools. Each of their statements made clear that this was the *desired* result of the new admissions policies—and that this was (at least in part) a motivating factor for these changes. Consider once again the statements from Dr. Jubilee:

> [A]s a District . . . we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.

Appx1521; *see also* Appx1522 (complaining that "current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City."). And consider the statements from Ms. Lynch admitting that changed its admissions policies in response to the murder of George Floyd and for the purpose of "ensur[ing] equity":

> [O]ur District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we committed to examining all of our processes, procedures and practices to ensure equity
> . . . .

Appx1530–1531; *see also* Appx1558 ("[A] good deal of the discussion has been about access and equity to these schools, *so it's not just based on racial dynamics*." (emphasis added)).

The district court was also too quick to dismiss the zip-code preferences as evidence of racial motivation. Appx34–35. The district court overlooked the fact that the Asian-American population in each of the six preferred zip codes is significantly below the 7% level of Asian-Americans in the overall student body of the Philadelphia public schools—and *far* below the percentage of Asian-American students that attended Masterman, Central, Carver, and Palumbo during the 2021–2022 school year. *Compare* Appx1215–1216 (¶ 28) (showing that Asian-Americans made up 36% of the student body at Palumbo, 14% at Carver, 38% at Central, and 26% at Masterman); *with supra* at 8 (showing that the percentage of Asian-American residents in the six preferred zip codes is 3.5%, 1.1%, 3.5%, 1.6%, 5.7%, and 1.7%). The district court and the school district claim that those six zip codes were chosen because they had "the lowest percentage of students enrolled at Masterman, Central, Carver, and Palumbo between 2017 and 2021." Appx36. But even if this is true, the fact remains that the school district selected these six zip codes after the Board of Education had announced in its Goals & Guardrails document that it would increase the percentage of qualified black and Hispanic students from 33.8% in August 2020 to "at least 52.0%" by August 2026—a goal that can be achieved only by *reducing* the percentage of Asian-American and white students in the pool of "qualified" applicants. All of this evidence,

considered together, shows that the school district was motivated (at least in part) by a desire to alter the racial composition of its criteria-based schools, and it is assuredly enough to establish a genuine question of fact that entitles the plaintiffs to a trial.

## II. There Is A Genuine Dispute As To Whether The Change In Admissions Policies Had A Racial Effect

The data conclusively establish that the change to a lottery-with-zip-code preferences led to a dramatic increase in black admissions at Palumbo, Central, and Carver (+84%, +49%, +26%) at the expense of whites (–72%, –34%, –26%) and Asians (–29%, –10%, –12%). *See supra* at 26. It also led to a massive boost in Hispanic admissions at Central and Carver (+89%, +75%). *See id.* That is sufficient to create a genuine factual question on whether the change in admissions policies had a racial effect. Indeed, defendants would have been hard pressed to show how *they* would be entitled to a trial on this issue if the plaintiffs had moved for partial summary judgment on this question.

The district court acknowledged that the plaintiffs had produced data showing that the change in admissions practices "led to a dramatic increase in [b]lack admissions at Palumbo, Central, and Carver (+84%, +49%, +26%) at the expense of whites (–72%, –34%, –26%) and Asians (–29%, –10%, –12%),"[18] and "led to a massive boost in Hispanic admissions at Central and Carver

---

18. Appx24–25 (quoting Pls.' Opp. to Defs.' Mot. for Sum. J., ECF No. 94, at 14–15) (internal quotation marks omitted).

(+89%, +75%)."[19] Yet the district court held that this data failed to raise "a genuine dispute of material fact"[20] on the racial-effects prong for three reasons.

First, the district court held that the plaintiffs could not use the racial makeup of the students admitted during the 2021 Admissions Process as the relevant baseline of comparison because that would make "the results of the 2021 Admissions Process" into "'an immutable quota.'" Appx28 (quoting *Coalition for TJ v. Fairfax County School Board*, 68 F.4th 864, 881 (4th Cir. 2023); *see also* Appx28 ("There is no reason to assume or find that the results of the 2021 Admissions Process—*i.e.*, the number of admissions offers extended per racial group—must remain impervious to change."). But the plaintiffs are not arguing that the school district is forbidden to adopt new admissions policies that alter the racial makeup of its criteria-based schools. Their claim is only that the school cannot adopt new admissions policies that change the racial composition of its students *when that change in admissions policies is motivated by a desire to achieve racial balancing. See, e.g., Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object*." (emphasis added)); *Village of Arlington Heights*

---

19. Appx25 (quoting Pls.' Opp. to Defs.' Mot. for Sum. J., ECF No. 94, at 15) (internal quotation marks omitted).
20. Appx25, Appx28, Appx31.

*v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified.").

Imagine a school or a college that adopts a new admissions policy with the avowed intention of reducing the number of black students—perhaps something analogous to the "Grandfather Clause," which would grant automatic admission to students whose parents or grandparents attended the school. *Cf. Guinn v. United States*, 238 U.S. 347 (1915). A policy of that sort is unlawful and must be enjoined, not because it reduces the number of black students, but because the reduction in black enrollment was a desired aim of the new admissions regime. It is the *combination* of discriminatory intent and discriminatory impact that dooms the policy—disparate impact alone is never sufficient to establish a violation of Title VI or the Equal Protection Clause. *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001); *Washington v. Davis*, 426 U.S. 229, 246 (1976).

Second, the district court criticized the plaintiffs' data for focusing only on the raw number of students accepted from each of the relevant racial groups, without accounting for the number of students from each racial group that *applied* to the city's elite criteria-based high schools in 2021 and 2022. Appx28–31. In the district court's view, "the relevant inquiry" is "whether the challenged admissions policy resulted in admitting a disproportionate number of students in any racial group out of those who applied." Appx29; *see also* Appx30–31 (holding that the racial-impact prong requires a

comparison of "the admissions rate . . . of eligible Black and Latino students with the admissions rate of other racial groups, like eligible White students."). But *any* type of racial effect on the students admitted to the city's criteria-based high schools will violate the law, so long as the policy that caused that change was adopted with the purpose of altering the racial composition of the student body. *See Miller*, 515 U.S. at 913 ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object*." (emphasis added)); *Arlington Heights*, 429 U.S. at 265–66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified."). The plaintiffs do not need to produce evidence of the "admissions rate" (or the "success rate") of each racial category; it is enough to show that the racial demographics changed and that those changes were caused by a new admissions policy that sought to alter the racial composition of the city's criteria-based schools.

Third, the district court faulted the plaintiffs for failing to produce "evidence that the changes to the admissions plan caused 'similarly situated individuals of a different race [to be] treated differently.'" Appx31 (quoting *Doe*, 665 F.3d at 550). The district court explained:

> All qualified students that reside within the six zip codes were treated the same regardless of race: they all were automatically admitted to any criteria-based school that they applied to. . . . All qualified students who reside outside of the six zip codes

> were also treated equally: they all had an equal opportunity, through the computerized lottery, to receive admission to each criteria-based school where they applied. . . . The only differentiating factor was on the basis of geography, not race—and the Court cannot find a genuine dispute of material fact on the question of racially discriminatory impact based on that.

Appx31 (citations omitted). But the district court's analysis conflates the issue of discriminatory effect (*i.e.*, disparate impact) with discriminatory classification (*i.e.*, disparate treatment). Of course the zip-code preference classifies "on the basis of geography, not race,"[21] and the lottery classifies on the basis of luck. But they *still* have a racially discriminatory effect because Asian-American residents are grossly underrepresented in the preferred zip codes,[22] and because the lottery system caused a dramatic reduction in offers of admission to white and Asian students at Palumbo, Central, and Carver.[23] The discriminatory-effect prong requires the plaintiffs to produce evidence only of a racially disparate impact; it does not require them to show disparate treatment or produce evidence that "similarly situated individuals of a different race [were] treated differently." Appx31.

---

21. Appx31.
22. *See supra* at 8.
23. *See supra* at 25–26.

# CONCLUSION

The district court's judgment should be reversed, and the case should be remanded for trial.

Respectfully submitted.

/s/ Jonathan F. Mitchell

| | |
|---|---|
| WALTER S. ZIMOLONG | JONATHAN F. MITCHELL |
| Zimolong LLC | Mitchell Law PLLC |
| Post Office Box 552 | 111 Congress Avenue, Suite 400 |
| Villanova, Pennsylvania 19085 | Austin, Texas 78701 |
| (215) 665-0842 | (512) 686-3940 (phone) |
| wally@zimolonglaw.com | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

REED D. RUBINSTEIN
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org

Dated: February 13, 2025 *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the U.S. Court of Appeals for the Third Circuit.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*

Dated: February 13, 2025

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,074 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

3. The text of the electronically filed brief is identical to the text in the paper copies that will be provided.

4. The electronically filed brief has been scanned with the most recent version of VirusTotal and is free from viruses.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*

Dated: February 13, 2025

## CERTIFICATE OF SERVICE

I certify that on February 13, 2025, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Third Circuit and served through CM/ECF upon:

William Kennedy
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants-Appellees*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Plaintiffs-Appellants*